**ATTACHMENT C**

**AFFIDAVIT**

STATE OF WEST VIRGINIA  )
                        )
COUNTY OF CABELL        )

I, Antonio Ortega, being first duly sworn, do hereby depose and state that as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am employed as a Special Agent with the Federal Bureau of Investigation (hereinafter "FBI)", assigned to the Huntington, West Virginia, Resident Agency Office of the Pittsburgh Division. I have been employed as a Special Agent for the FBI since July 2018. I am currently tasked with investigating violations of federal law within the Southern District of West Virginia and elsewhere. As part of my duties, I have received training regarding the investigation of various federal crimes including, but not limited to, drug trafficking, complex financial crimes, civil rights, and violent crimes. By virtue of my FBI employment, I perform and have performed a variety of investigative tasks, including conducting arrests and the execution of federal search warrants and seizures. As a Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).

2. During my tenure with the FBI, I have participated in numerous drug investigations during the course of which I have (a) been the affiant on Title III wiretap affidavits (b) conducted physical and wire surveillance of individuals engaging in drug trafficking; (c) executed search warrants at locations where drugs, drug proceeds, and records of drug transactions have been found; (d) reviewed and analyzed numerous taped conversations and recordings of drug traffickers; (e) debriefed defendants, witnesses, and informants; and (f) monitored wiretapped conversations of drug traffickers and reviewed line sheets prepared by wiretap monitors. Through my training and experience, I have become familiar with (a) the manner in which illegal drugs are transported and distributed; (b) the method of payment for such drugs; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

3. This affidavit is made in support of an application for a search warrant for information associated with cellular telephone number (330) 926-6602, (hereinafter "SUBJECT TELEPHONE #1"), that is stored at premises controlled by Sprint, a wireless telephone service provider headquartered at 6480 Sprint Parkway, Overland Park, Kansas 66251. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A)

to require Sprint to disclose to the government copies of the information further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review the information to locate items described in Section II of Attachment B.

4. The facts set forth in this affidavit are based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a search warrant, it does not set forth each and every fact that I or others have learned during the course of this investigation.

5. Based on facts set forth in this affidavit, there is probable cause to believe that a violation of 21 U.S.C. § 846 (conspiracy to distribute methamphetamine) has been committed by DENNIS MOSLEY and others as yet unknown. There is also probable cause to search the information described in Attachment A for

evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

## BACKGROUND ON WIRELESS PROVIDERS

6. In my training and experience, I have learned that Sprint is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell site data, also known as "tower/face information" or "cell tower/sector records." Cell site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. Accordingly, cell site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

7. Based on my training and experience, I know that Sprint can collect cell site data about SUBJECT TELEPHONE #1. I also know that wireless providers such as Sprint typically collect and retain cell site data pertaining to cellular phones to which they provide service in their normal course of business

in order to use this information for various business-related purposes.

8. Based on my training and experience, I know that wireless providers such as Sprint typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service. I also know that wireless providers such as Sprint typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify SUBJECT TELEPHONE #1's user or users and may assist in the identification of co-conspirators and/or victims.

**FACTS IN SUPPORT OF PROBABLE CAUSE**

9. On July 8, 2019, investigators received authorization from United States District Judge Robert C. Chambers to intercept communications occurring over a telephone utilized by GEORGE LANGFORD (hereinafter "LANGFORD"), telephone number (304)

373-8955 (hereinafter "SUBJECT TELEPHONE #2"). LANGFORD is a methamphetamine and heroin dealer from Akron, Ohio, who distributes methamphetamine in the Southern District of West Virginia. During the course of interceptions, it was discovered LANGFORD was communicating with MOSLEY, regarding the distribution of methamphetamine.

10. On July 21, 2019, at approximately 11:59 a.m., LANGFORD, while already on the phone with CALVIN WELLS (hereinafter "WELLS"), a co-conspirator in the drug trafficking organization, and using SUBJECT TELEPHONE #2, made a three-way call to MOSLEY on the SUBJECT TELEPHONE #1. The following was discussed:

| | |
|---|---|
| LANGFORD: | Yo. |
| MOSLEY: | Hello. Yo. |
| WELLS: | Yo. Yo. Yo. Yo. What's up? |
| MOSLEY: | Brotha man, brotha man, what's the deal? |
| WELLS: | How you? |
| MOSLEY: | Shit, getting this (unintelligible) together. He showing me how he about to do this shit. It's going, it's going come. The whole play come up to 22, 22-5. The whole play. That's what I paid for the, the whole 9. 22, yeah, but hold on, hold on, hold on. (Unintelligible). Huh? |
| WELLS: | Yo? |
| MOSLEY: | (MOSLEY speaking to someone in the background: Yeah, (unintelligible). I already gave him the other 500. So he got, |

                    that mean he got, he got 18. We gave him, we gave him 15 the first time. We gave him 18 last time, and now 22-5, 22-5 this time, and he said on the front he's going to be wanting 28. So when he's fronting them, he giving us, we getting fronted what we cop from here on, we getting fronted what we cop from here on out. So, so, so the front cause we waited, we waited 4 days. Right? We waited 4 days for every play, right? So 2 days, 2 days, right. So, he going give us at least a week for whatever we get fronted. I ain't trying to hear no, you, what you get fronted you don't pay that day).

. . .

| | |
|---|---|
| MOSLEY: | Hey, yeah, hey bro. |
| WELLS: | Yo. |
| MOSLEY: | Yeah, that's what I'm bout to, um, you hear me? You heard everything going on? |
| WELLS: | Yeah, I heard everything, I heard, I heard it. |
| MOSLEY: | Well, I'm about to go in here, but I'm about to go in here right now, and um, I'm about to tell you the, the exact date (unintelligible). The exact dates for our receipts and shit. You hear me? |
| WELLS: | Yeah, I hear you. |
| MOSLEY: | Hold on just stay on the line. |

. . .

| | |
|---|---|
| MOSLEY: | Guaranteed Wednesday bro. Facts. |
| WELLS: | Alright, alright, alright bet. |
| MOSLEY: | Hold on, hold on, hold on bro, and that's on everything bro. Facts. Wednesday. |

11. Based on my training and experience and the facts of the investigation thus far, I believe this conversation involves MOSLEY discussing with both LANGFORD and WELLS the date in which the package of methamphetamine will arrive from a parcel delivery service. MOSLEY first discusses that he paid $22,500 for the package, which includes nine pounds of methamphetamine (Shit, getting this meth together. He showing me how he about to do this shit. It's going, it's going come. The whole play come up to 22, 22-5. The whole play. That's what I paid for the, the whole 9.). MOSLEY then discusses the previous prices he paid for methamphetamine with someone in the background and how some of the methamphetamine will be given to him on consignment (We gave him, we gave him 15 the first time. We gave him 18 last time, and now 22-5, 22-5 this time, and he said on the front he's going to be wanting 28. So when he's fronting them, he giving us, we getting fronted what we cop from here on, we getting fronted what we cop from here on out.). MOSLEY continues that discussion further with someone in the background, and then MOSLEY asks WELLS if he agrees with the prices for the methamphetamine (Yeah, that's what I'm bout to, um, you hear me? You heard everything going on?). WELLS agrees, and then MOSLEY states that he is about to walk into the parcel delivery service to check when the package will be delivered (Well, I'm about to go in here, but I'm about to go in here

right now, and um, I'm about to tell you the, the exact date.). After speaking with someone in the background, MOSLEY tells WELLS and LANGFORD that the package will arrive on Wednesday (Guaranteed Wednesday bro. Facts.).

12. On July 24, 2019, at approximately 11:34 a.m., LANGFORD, while already on the phone with WELLS and using SUBJECT TELEPHONE #2, made a three-way call to MOSLEY on SUBJECT TELEPHONE #1. The following was discussed:

| | |
|---|---|
| MOSLEY: | George, you got a bitch? |
| LANGFORD: | Do I got a bitch? |
| MOSLEY: | Yeah, you got a bitch, you got a (unintelligible) that like to drive? |
| LANGFORD: | Well, I got a license, but yeah, I can find a bitch though. |
| MOSLEY: | Yeah, you got it bro, yeah, I think you should get you, I mean, we going to talk (unintelligible) but uh, yeah come on bro, come on right now though, come on. |
| LANGFORD: | I'm getting dressed right now, I'm bout to call me a bitch up right now. |
| MOSLEY: | Yeah, get it together, come on bro cause I'm ready to take off. (Unintelligible). |
| LANGFORD: | Oh yeah, give me, give me 45 to an hour man, and I'mma have a bitch and be ready. |
| MOSLEY: | Hour, what, how long? |
| LANGFORD: | I said 45 minutes to an hour, not longer than an hour, I'mma have the bitch picked up and ready and everything. |

| | |
|---|---|
| MOSLEY: | Alright, so I am saying bro, we jumping on the, bro we jumping on the express way at 12:30. |

13. Based on my training and experience and the facts of the investigation thus far, I believe this conversation involves MOSLEY discussing with LANGFORD that LANGFORD should find a driver to transport him to pick up the package of methamphetamine. MOSLEY asks LANGFORD if he has someone that can drive him (George, you got a bitch?). LANGFORD states that he has a license and the ability to drive himself, but he can find someone to drive him instead (Well, I got a license, but yeah, I can find a bitch though.). MOSLEY then says they will be travelling on the expressway to pick up the package at 12:30 p.m. (Alright, so I am saying bro, we jumping on the, bro we jumping on the express way at 12:30.).

14. On July 24, 2019, at approximately 3:21 p.m., LANGFORD, using SUBJECT TELEPHONE #2, contacted MOSLEY on SUBJECT TELEPHONE #1. The following was discussed:

| | |
|---|---|
| MOSLEY: | Yo. |
| LANGFORD: | Shit I am here. |
| MOSLEY: | I'm right here. I am right here in front of this little food spot. |
| LANGFORD: | Which one? |
| MOSLEY: | (Unintelligible). This one on the side, this one on the side bro. |
| LANGFORD: | You talking bout the um, corner store? |

MOSLEY:     No, come to the other side, come around. Come to other side of the car wash, come behind the car wash, you gon see it.

LANGFORD:   Alright, I'm about to pull in, I'm bout to pull in right over there. They have a bathroom man? I got to piss.

MOSLEY:     Yeah, hell yeah, we in a restaurant.

LANGFORD:   What is it called? Debbies?

MOSLEY:     I don't know come right here, I am right here, you will see me.

LANGFORD:   Alright.

MOSLEY:     Yeah, you can't miss it.

15. Based on my training and experience and the facts of the investigation thus far, I believe this conversation involves MOSLEY discussing with LANGFORD his location in Columbus, Ohio, which investigators were able to further identify through location pings, so that LANGFORD can meet up with him to pick up his portion of the methamphetamine. LANGFORD tells MOSLEY he has arrived (Shit I am here.), and MOSLEY tells LANGFORD he is waiting in the adjacent restaurant (Yeah, hell yeah, we in a restaurant.). MOSLEY further advises LANGFORD to come into the restaurant (I don't know come right here, I am right here, you will see me.), and LANGFORD agrees.

16. On January 15, 2020, MOSLEY and LANGFORD, along with other named defendants, were charged by a grand jury in this district in a second superseding indictment with various

controlled substance offenses including the offense of conspiracy to distribute methamphetamine in violation of 21 U.S.C. § 846.

## CONCLUSION

17. Based on facts set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of the offense enumerated above has been committed by MOSLEY and others as yet unknown. There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes as further described in Attachment B.

Antonio E. Ortega, Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence this 25th day of February, 2020.

CHERYL A. EIFERT
United States Magistrate Judge